AMALGAMATED GUM CO. v. CASEIN CO. OF AMERICA.

(Circuit Court, N. D. New York, July 24, 1906.)

SALES—CONTRACTS—CONSTRUCTION.

Plaintiff, a manufacturer of a patented paper coating under a secret process for the purpose of marketing the same, agreed to sell to defendant as its sole customer on condition that defendant should accept specified quantities of the product, but that if defendant should not accept such

quantities, then plaintiff should be at liberty to sell to others. The agreement then required plaintiff to sell further quantities "if asked for" and due notice given by defendant, the last clause of the agreement being that it was understood and agreed that in certain contingencies or the happening of unforeseen events impairing the ability of either party to perform the conditions of the contract as to the "furnishing or using" of the quantity of products previously provided for, then the parties should be relieved during the period of such disability from "furnishing or taking" such products, otherwise than the capacity and ability of the parties to "supply or use" the amount required. The contract also provided for payment for amounts "taken" by defendant. *Held*, that the contract did not contain any covenant or obligation binding defendant to accept or take the product in the amounts specified, and that no such covenant could be implied.

At Law. Action on contract to recover damages in the sum of $30,000 which complainant alleges it has sustained by reason of alleged breach of contract. The case was tried before the court, a jury being waived.

John T. Norton, for plaintiff.

George J. Gillespie (T. E. Hancock, of counsel), for defendant.

RAY, District Judge. On the 3d day of September, 1903, the parties in this action entered into a written contract whereby, in consideration of $1 and of the covenants and agreements in the contract contained, the plaintiff agreed with the defendant as follows:

"The said party of the first part agrees to sell its entire output of its paper coating products for the paper coating trade of the United States and Canada, covering all the products now made by it or which may be made in the future for the paper coating trade and any and all improvements thereon, unto the said party of the second part, upon condition that the said party of the second part shall accept from the said party of the first part for the year beginning January 1, 1904, three hundred and thirteen tons of the said paper coating products and for the year beginning January 1, 1905, six hundred and twenty-six tons of the said products, and for the year beginning January 1, 1906, twelve hundred and fifty-two tons of the said products and for each of the two years beginning January 1, 1907 and January 1, 1908, fifteen hundred and sixty-five tons of said products upon the terms and conditions hereinafter set forth; but in case the said party of the second part shall not accept from the said party of the first part the quantity of said products hereinbefore set forth in any of the years above described, then, and in that case, it is understood and agreed that the said party of the first part shall be and is at liberty to sell its paper coating products in the United States and Canada without reference to the said party of the second part except to protect the said party of the second part with such customers of the party of the second part as shall be supplied with said products of the said party of the first part direct by the said party of the second part. The said party of the first part further agrees to supply the said party of the second part with reasonable quantities of said product within the manufacturing capacity of said party of the first part beyond the quantities above specified provided the said party of the second part shall give due and timely notice of such excess quantities required. The said party of the first part further agrees not to sell any of its paper coating products to the paper coating trade in the United States and Canada, either directly or indirectly, so long as the said party of the second part shall accept from the said party of the first part in the times above specified the quantities of said products above specified and that if any of said products shall reach any of the paper coating trade in the United States and Canada indirectly from the said party of the first part, the said party of the first part will immediately upon notice to that effect, cause its

said products to be withdrawn from such trade and from all persons, firms and corporations who shall furnish said products indirectly to such trade and that the said party of the first part will do everything within its power to protect the trade, rights, and interest of the said party of the second part under this agreement. The said party of the first part hereby guarantees to furnish unto the said party of the second part goods of a quality at least as good as the carload of its said products shipped to the said party of the second part at Bellows Falls last previous to the date of this agreement; a sample of which is to be preserved by both parties as a standard."

The defendant agreed with the plaintiff as follows:

"The said party of the second part agrees to pay for the said paper coating products to be furnished to it by said party of the first part the sum of five and one-half cents per pound f. o. b. cars Troy, N. Y., in carload lots, less freight to any point east of the Mississippi river, sixty days net or cash less 6 per centum per annum for unexpired time as a discount."

The contract contained other clauses material to this controversy hereafter quoted or referred to.

A carload of the plaintiff's paper coating product had been shipped to and received by the defendant, and a sample was preserved by defendant as a standard for future deliveries and a barrel thereof sent to plaintiff as a standard. Deliveries under the contract commenced October 27, 1903, when 150 bags of 275 pounds each, or 41,250 pounds, were delivered. November 4th, 150 bags of 275 pounds, or 41,250 pounds were delivered. In all 82,500 pounds. These goods were accepted and paid for finally, but not without complaint as to quality that same were not of the quality of the sample and not as good as contracted for and agreed to be delivered. Complaint was also made that delivery was not being made according to the terms of the contract. The defendant refused to take and pay for more, but the plaintiff continued to manufacture and store the product, notifying defendant it was on hand and awaiting delivery subject to the defendant's order. The plaintiff made a test as to quality by comparison and made the product not taken by defendant of the same materials and by the same process used in making the carload from which the sample was taken and retained under the agreement. The plaintiff described the test of the material as follows:

"Yes. We test our raw material first, to know when we start that the materials are all right. And then at the finish we test it by boiling it up, allowing it to stand, put it alongside of the previous lot which has been made, and treated in the same way. And decide for ourselves that it is up to the standard."

The witness, then, under objection, gave his opinion the product not taken by defendant was as good as the sample. There was no pretense of a test by use. After the contract was made plaintiff enlarged its plant and facilities for making, so as to comply with its demands, at an expense of about $40,000. At the time the agreement was entered into the plaintiff had contracts with other parties. During 1904, and after the defendant refused to accept more of this product, which is made by a secret process not disclosed, the plaintiff tendered and has kept and has in store ready for delivery to defendant, 540,500 pounds of the value of $29,727.50, at the price named in

the contract. The interest on this sum from January 1, 1905, to the day of the trial is $2,407.92; total, $32,135.42. While the agreement bears date September 3, 1903, it was not actually executed until October 5, 1903. The plaintiff is a corporation organized to make this special product under its secret processes, some of which are patented, and the plaintiff also knew when the contract was made the purpose for which defendant desired and intended to use it, and as an inducement to the making thereof, stated it was suitable and proper for the use and purpose intended. The defendant had also purchased of plaintiff, tested, and used for this purpose, quite a quantity of this material or product, and such tests had been satisfactory. The plaintiff on the trial elected under his complaint to stand on the proposition that under the proper construction of this contract the plaintiff had agreed and contracted to make and sell to defendant the several amounts of the product specified in the agreement, and that the defendant had contracted and agreed to take at or within the times mentioned such respective quantities, and that the plaintiff had an election of remedies and had elected to offer the product made, and, defendant refusing to take it, store and keep it in tender for the defendant and sue for the contract price. That this was its form of action, and that it was under no obligation to sell or reduce damages by selling and disposing of the product and bring action for the difference. The plaintiff also contends that as to the goods or product accepted by the defendant there was no warranty as to quality that survived acceptance, and that, however inferior in quality and worthless, defendant cannot counterclaim his damages on account thereof. The plaintiff also contends there was no market value for this product.

The defendant contends the contrary of this last proposition and evidence of the market value of the product of plaintiff mentioned in the agreement was admitted. The words, "The said party of the first part hereby guaranties to furnish unto the said party of the second part goods of a quality at least as good as the car load of its said products shipped to the said party of the second part at Bellows Falls last previous to the date of this agreement," are not words of description, but are express guaranty of the quality. October 29, 1903, the defendant wrote plaintiff as follows:

"We shall have to ask you to withhold shipments for the present, and until advised. The delay in shipments has caused us a great deal of trouble. We started out using your material on a large scale, and on your assurance that you could ship a carload a week. You were able, however, to ship only about half that amount, which compelled us to change off of it on some orders, and it is now impossible for us to resume its use as our customers are disgusted. We have also just received very adverse reports from one customer to whom we were sending the largest amounts, and with whom it had seemed to work satisfactorily on the initial trials; but later on developed objections, which he claims are very serious, and he has countermanded his orders, and will take nothing in the future but straight casein. We are investigating the matter, and shall try to overcome the difficulty, and hope for success. I do sincerely hope that we can soon ask you to resume shipments, but until we can get some of these people better satisfied, it is impossible."

January 1, 1904, defendant wrote the plaintiff as follows, by Mr. Charles:

"We have on hand several carloads of your material, and our use for it at the present time is very limited, for the reason that it has not given satisfaction. The concerns to whom we expected to supply it largely have turned it down. We are still working on them, but, so far, without satisfactory results. We are using a small amount, but, at the present rate, it will take us several months to use up one-half the amount we have. Mr. Hall told the writer that you recently said that you were glad that we had no orders at the present time as you were far behind on your orders, and were able to dispose of your entire product at better prices and that you were far behind even at that. Therefore, it occurred to me that you might be very willing to take back, say, two carloads of the stock and which we would like to get rid of, or else, leave it here on consignment until we can dispose of it. It certainly does not give the satisfaction represented. We would like to use it, and it would help us very much if we could, as we are short of casein, but we have had so many complaints we do not dare to take the chances."

Also another by its President, W. A. Hall, viz:

"Replying to your favor of December 29th. We will not care for any shipments during the month of January, as we have a number of carloads of your material on hand now, and do not know what disposition to make of it. Sorry that we have met with such poor success. As soon as I return to New York I want to take up the question of the special customer with you, and see if we can bring any trade from that direction. Although we are very short of casein, we are using only a few hundred pounds a week of your material, as we have had trouble wherever we have put it out. We are working, however, to overcome the difficulties and try to get it into better shape for the purpose."

January 2, 1904, the plaintiff made reply as follows:

"New York, N. Y., Jan. 2d, 1904.

"Casein Co. of America, Bellows Falls, Vt.—Gentlemen: Your esteemed favor of the 1st at hand, contents carefully noted, and with our increased manufacturing capacity, we are now fully up to our orders, and in fact have written to your New York office on the 29th ult., that we could spare one or two carloads for shipment the early part of this month. Thus we are not for the present in need of any of our Paper Coating. We are however, anxious to know if you intend to push our product with the Paper Coating Manufacturers, for if not, we would like to do so ourselves, knowing quite well that the goods we are now turning out will give good satisfaction for that purpose.

"We are gentlemen, always with pleasure to your favors,

"Yours very truly.                              Amalgamated Gum Co."

January 6, 1904, Mr. Hall, President, replied as follows:

"Amalgamated Gum Company, Troy, N. Y.—Gentlemen: Replying to yours of the 2nd inst., which has been referred to me from Bellows Falls office. You ask if we intend to push your paper coating product, and if not you will do so yourselves, and I note you say that you know that the goods you are now turning out will give good satisfaction for the purpose. I would like to see a sample of the goods which you are now turning out. Judging from your letter, these must be an improvement on those which we have had. We are certainly prepared, and only too glad, to push the goods provided they will give our customers satisfaction. So far, they have utterly failed in that respect, but we have not been fully satisfied that all the adverse reports sent us were due to the quality, and we are still working on the customers who turned them down. We lost considerable trade because you were unable to fill the orders in accordance with your promise. The reasons which you gave for your inability in that direction were satisfactory, but that did not help us or our customers. I fully explained this to you in letters written at the time. We commenced to use your goods on several orders and then, not receiving any more at the time promised, we were compelled to fill our

orders without its use. Changing from one to the other and back again caused much dissatisfaction on the part of our customers, who declined to make any more experiments, and who insisted upon no further changes. I fully explained to both Mr. Connors and Mr. Ducas the 'special customer' matter,— that we had been relying upon a large consumption from this concern, and who suddenly turned down the article, claiming all sorts of inferiority for the goods which were produced with it. We are still working on this customer on the lines outlined by me to Mr. Ducas, and if you wish us to continue we will be glad to do so. As it is, we have on hand some 4 or 5 carloads of your material, for which we have at present time but little use, and through no fault of ours. We would like to return these goods to you, or we will be willing to store them for you without expense and work them off to the best of our ability. If we could get the trade of this 'special customer' we could move the entire amount very soon. We have delayed paying for the goods for the reason that they did not do the work which you claimed for them, and, as above stated, because your failure to ship as promised caused us the loss of much of the trade that we did obtain.

"Yours very truly, Wm. A. Hall, A. W. P."

### And March 24, 1904, again:

"We are willing to release you from the contract if you will take off our hands a portion of the gum which we bought of you. We have been working it off very slowly and can. I think, work it all off in time, but it would be much more difficult for us to dispose of it if you were released from the contract, and were enabled to sell against us. Therefore we should not care to release you unless you relieved us of a certain amount of this material. We do not ask you to take it all. We are willing to limit the amount to three carloads. You have insisted that this article which you have sold to us was your first quality and that it was sold to us at a low price. Therefore, if you are very anxious to be relieved of this contract, we should not think that the requirement to take back so small an amount would stand as any very great obstacle."

### And April 12, 1904, as follows:

"Gentlemen: I understand from Mr. Showerin that either you or Mr. Ducas told him that you could readily sell your product to the Champion Coated Paper Co. of Hamilton, Ohio. I would state that we will give you permission to do so, and will assist you in any way that is in our power, provided you will utilize for that purpose the material which we have on hand, which we purchased from you? If that concern can use it at all, they can use very many carloads, and the three or four cars that we have, and would like to dispose of would go very quickly. Furthermore, if you succeed in getting their trade and will take off from our hands the few cars which we have, we will release you from the contract which you have with us and you can then sell the material to coating mills where you choose, as long as it does not interfere with any of our patented processes."

### And September 29, 1904, again, as follows:

"The Amalgamated Gum Company, Troy, N. Y.—Gentlemen: Referring to the conversation that I had with Mr. Connors several months ago, I would state that we have since that time consistently exerted ourselves toward the establishment of a demand for your paper coating adhesive, but with very little success, and practically no encouragement, which leaves on our hands a very considerable stock of your goods which we have bought and paid for, which we would be very glad to sell to you at a reduced price. We are informed that you have offered your goods to the coating mills direct, notwithstanding the contract which we have with you to the contrary. We, however, will make no issue on this point, and as we are unable to do anything with it, we herewith release you from any obligation

on your part not to sell or offer for sale the same to the paper coating trade, excepting as such might be in the infringement of any of our patents. "Yours truly,     Casein Co. of America, William A. Hall, President."

October 7, 1904, the plaintiff made reply as follows:

"The Casein Mfg. Co., Hanover Bank Bldg., Pine & Nassau Sts., New York City.—Gentlemen: Upon the receipt of your letter of date the 29th ult. we submitted it together with a copy of the contract, to our attorney for his advice. We are advised that the product which we have manufactured for you and concerning which we have given you repeated notifications and request for shipping orders you are required to take under the terms of the contract. It would be a strange construction of the contract that we should be compelled to go out of business for a year upon your refusal to take goods up to the last moment and then hand us an order for the entire output during the year. We do not believe 'that any such construction can be placed upon the contract and certainly it was not the intention when it was made. The fact is that we have nine months of our product ready for you which we have been holding at considerable expense to ourselves and which you were required to take under the terms of the contract made. We cannot release you from your obligation to take that product for otherwise it would be necessary for us to admit that the contract gives you the privilege of .practically. keeping us out of the market and out of business for a period of nine months without any redress. If, however, you are willing · to liquidate the damages which have been done or to take the product which we have manufactured for you, then we will consider your proposition of cancelling the contract as of the first of October. Whatever we do, however, in the course of negotiations upon that subject must be strictly understood not to interfere with our rights under the contract· or your obligation as we view it to take the full quantity of our out-put up to the end of the first year of the contract. If you are disposed to either take the goods or negotiate an adjustment for the losses which you have imposed upon us in case you do not take the goods and pay for them, we will be glad to enter upon such negotiations with you.

"Yours very truly,    Amalgamated Gum Co., William Connors, Treas."

October 11, 1904, the defendant replied as follows:

"The Amalgamated Gum Co., Troy, N. Y.—Gentlemen: Replying to yours of · the 7th, there is apparently little that we can say on this subject that has not already been said. We have diligently endeavored to push the sale of your goods and dispose of not only the large quantity which we had on hand (and still have on hand) and which we had paid you for, but also to find a market for further quantities of your material which you stated you were ready and able to furnish, and it is much to our regret that we have found it impossible to accomplish this. We never have made any contract with you to take any specified amount of goods. We did start off taking large quantities, but it did not give satisfaction. We notified you immediately that our customer reported the goods did not answer the requirements, and that they did not do what you represented they would. We gave you permission to sell direct to the coating trade a long time ago provided you would first draw on the material of your manufacture which we had on hand, and which we had paid 'for, and for which we had no use. Therefore we have not debarred you from selling your product. If you had any demand for it you could have easily disposed of the amount we had, and could have then drawn on your own freshly made goods. We did not hang you up in any way. We notified you also months and months ago that we did not care for any more of this material until either you or we could make it work successfully, and neither you nor we have been able to do this. We are perfectly satisfied with our position, and which has been very clearly outlined to you.

"Yours truly,                              William A. Hall, President."

To this October 20, 1904, the plaintiff made reply as follows:

"The Casein Manufacturing Co., Hanover Bank Building, New York City. —Gentlemen: Your letter of date the 11th inst. is received and contents noted. We cannot agree with your interpretation of our contract. It is perfectly plain to us that by that contract you agreed to take certain quantities of our product in each of the years referred to in the contract and your failure to comply with those provisions will be a breach of the contract on your part. We have lived up to the contract in every respect and have been prepared to supply your orders up to the limit of the contract requirements. It is no answer to our position for you to say that you have given us permission to dispose of our product to the trade provided we would dispose of the material which you have on hand and which we delivered to you. That would be a peculiar state of affairs if it should be for a moment seriously considered as a business proposition. You are certainly well aware that we never accepted any such unbusiness-like suggestion, never acted upon it and would not, as very likely you expected that we would not. So that there may be no misapprehension on your part and no misunderstanding between us, we desire again to call your attention to the terms of the contract between our companies and to notify you that the contract must be lived up to to its fullest extent and that we have not done and have not intended to do and will not do and do not intend to do anything to release you from the terms and requirements of that contract in any respect.

"Yours very truly, Amalgamated Gum Co., William Connors, Treas."

It should be remarked that the uncontradicted evidence in the case establishes that this product sent to defendant and received and finally paid for by it was, mostly, worthless for the purpose for which intended and was not saleable in the market. From this correspondence it is evident that the defendant claimed from the very beginning that it had not agreed to take and pay for any amount of this product unless specially ordered; that it could stop taking or dealing in it at any time. That its obligation was to pay for what it did take; that this was a joint agreement or undertaking of the parties by which the plaintiff was to make the product and in effect make the defendant, with slight exception, its sole customer and salesman to push the same in the market and in the paper trade and in consideration thereof defendant was to have control of its sale in the United States and Canada. That defendant undertook on its part to push its sale and use in the paper trade, and to pay for all it did accept or take a certain specified price, and, as a condition of this undertaking on its part, was to have the entire output of plaintiff in case it took the quantities specified in each year named, but not otherwise, so as to have exclusive control of its sale. This construction and interpretation was not for a long time, months, controverted by plaintiff, but it finally did take the ground, as appears from the recited correspondence, that defendant had absolutely agreed to take, accept, and pay for the quantities specified in the contract. But this would seem to have been after the product had proved a failure for the use intended. It is not established that the parties changed the contract in its main features in any respect material here or that any particular construction by conduct of the parties was placed upon it, although the long acquiescence in, or failure of the plaintiff to dispute defendant's construction, is entitled to its due weight in the case. The only material change that bears on its interpretation will be noted later.

The first clause or paragraph provides:

"The said party of the first part agrees to sell * * * unto the said party of the second part, upon condition that the said party of the second part shall accept from the party of the first part * * * but in case the said party of the second part shall not accept from the said party of the first part the quantity of said products hereinbefore set forth in any of the years above described, then and in that case it is understood and agreed that the said party of the first part shall be and is at liberty to sell its paper coating products in the United States and Canada without reference to the said party of the second part except to protect the said party of the second part with such customers of the party of the second part as shall be supplied with said products of the said party of the first part direct by the party of the second part."

I fail to discover any good and sufficient reason for the insertion of this language if there was or was supposed to be an outright and absolute agreement on the part of defendant to take the product in the amounts specified. It seems to me to be a provision that demonstrates the plaintiff did not understand defendant was binding itself to take the product. Then, comes an agreement to supply further quantities if asked for and due notice given. If a special amount in excess of that named was ordered by defendant, it of course became obligated to accept or take it. Hence the use of that word in the last clause of the contract hereafter referred to. Then, "The said party of the first part further agrees not to sell any of its paper coating products to the paper coating trade in the United States or Canada, either directly or indirectly, so long as the said party of the second part shall accept from the said party of the first part in the times specified the quantities of said products above specified," and also language that imposes an obligation to withdraw the product from the market so that none of same shall reach parties in the United States or Canada in competition with the defendant. The idea seems to be to encourage the defendant to build up and establish a trade and consumption of this article in the United States and Canada and protect it in so doing. The undertaking of defendant to do this might prove beneficial to it depending on the extent of its trade and the prices it should obtain. To build up such a trade and a demand for this new product of plaintiff made under secret processes would be beneficial to it. The second party is to control the market of this product in the United States and Canada if it takes the specified quantities in the years named, not otherwise.

The last clause of the agreement is in these words:

"It is hereby understood and agreed by and between the parties to this agreement that in case of fire, strikes, labor troubles, or the happening of other unforeseen events which shall impair the ability of either party to keep and perform the provisions of this agreement as to the furnishing or using of the quantity of products hereinbefore provided, then, and in that case, the said parties are relieved during the period of such disability from furnishing or taking said products in the quantities hereinbefore provided or otherwise than the capacity and ability of the said parties to supply or use the amounts referred."

It will be noted that there is an absence of any covenant or agreement on the part of defendant to buy, purchase, take or accept any of this product whatever. Plaintiff's agreement to sell to defendant is

"upon condition" that it "shall accept" the quantities specified in certain years, and "in case the said party of the second part shall not accept" then the party of the first part is fully relieved from its obligation, except in one instance, which is, that it will protect any customer of defendant to which it may be supplying the product direct. That is, if defendant has obtained a customer or customers for this product the plaintiff will continue to supply him or them. Plaintiff's agreement to sell the whole of its output to defendant is based on the willingness and ability of defendant to accept and take a certain amount thereof, specified, in each of the years named, and if it fails to take such amounts then plaintiff's obligation in that respect ceases, and the entire market is open to it. Can an agreement to take the product be implied from the language of the entire contract? Clearly not from any clause preceding the last one. In fact the language, until we come to that clause, negatives the idea of any agreement or obligation to purchase, take, or accept the product or any of it unless specially ordered. The agreement to sell is on condition that defendant does certain things, and, as defendant does not agree to do that thing or those things, it is clearly optional with it to do the act or acts or not to do them. But when we come to the last clause, the one last quoted, and which relates to fires, strikes, etc., we find this language referring to fires, etc., viz.: "which impair the ability of either party to keep and perform the provisions of this agreement as to the furnishing or using of the quantity of products thereinbefore provided, then, and in that case, the said parties are relieved during the period of such disability from furnishing or taking said products in the quantities hereinbefore provided, or otherwise, than the capacity and ability of the said parties to supply or use the amounts referred." Nowhere do we find any use of the words "purchase or buy," and even in this clause, instead of using the words "furnishing or purchasing" or "furnishing or accepting" or "furnishing or buying," as expressing or reciting the mutual obligations and mutual agreements, we find the parties saying "keep and perform the provisions of this agreement as to the furnishing or using," etc., not "accepting." But a little later they say, in a certain contingency, strike, etc., "the said parties are relieved during the period of such disability from furnishing or taking said products," etc. The word "taking" here implies an obligation as to taking if not to take; that is, receive or accept, and, if so, what was that obligation? Was it to take or accept and pay for the quantities specified in the first clause each year named? If so, why was a clause imposing such obligation omitted? Why were words clearly importing a purchase or an obligation and an agreement to purchase, or take, or accept such quantities omitted? The parties evidently had the particular matter or subject in mind, but in place of language plainly implying an agreement to purchase, take, and accept and pay for the amount of the product specified deliberately selected words indicating the contrary purpose. As seen, there was a clause in the contract imposing on the plaintiff the obligation to accept and pay for any extra amount or quantity it might order, and construing the words "the said parties are relieved during the period of such disability from

furnishing or taking such products," etc., so far as the word "taking" is concerned, to refer to this obligation, there is no ambiguity or conflict.

There is, in this agreement, a clause relating to a special customer, which, in substance, is this: The first party agrees to furnish the second party a limited quantity of such product at five cents per pound for one person, known as a "specified customer" and "the amount taken by such specified customer is to be considered as a part of the before mentioned amounts which it is necessary for the party of the second part to take from party of the first part in order to maintain an exclusive control." It seems to me that these words refer not only to the amounts specified in the first clause of the contract, but, in fact, explain and make clear the intention of the parties, viz.: That the arrangement was that defendant should build up the trade in this product, and, if it took the quantities specified in each of the years named, it was to have exclusive control of all sales in the United States and Canada, otherwise not; and in case defendant did not take such quantities then the market of the world was open to plaintiff with the one slight qualification named. In short they expressly refer to the quantities of the product mentioned in the first clause of the agreement as the amounts which it is necessary for the party of the second part to take from the party of the first part in order to maintain an exclusive control, not as the amounts the party of the second part had agreed to purchase and accept from the first party as they naturally would have done had there been any agreement to accept such quantities. Later, and December 3, 1903, a supplemental agreement as to this "specified customer" was made in which it is recited:

"In consideration of the efforts of the Casein Company of America to obtain for us the trade of the especial customer mentioned in the contract of September 3, 1903, we agree as follows:"

Here follow six covenants in the fifth, of which it is provided that the shipments are to be made under the name selected by Wm. A. Hall, the president of the Casein Company, and that such company is to be credited on such sales with the difference between the net selling price and $4.85 per hundred f. o. b. Troy, N. Y. And the 6th is as follows:

"It is further understood that the Casein Company of America will guaranty the payment of this account at the 4.85 price, and will see that full payments are made at such price to us within sixty (60) days of delivery."

Taking this agreement and its recitations in connection with the first agreement, it seems clear that the general intention of the parties was that defendant was to build up a trade in this product if it could, and, in consideration thereof was to have the entire control of its sale in the United States and Canada in case it succeeded in disposing of certain specified quantities which plaintiff agreed to furnish and sell to it, but that defendant did not agree and was not required to agree to take or accept such quantities or any quantity whatever. The absence of any agreement in words to purchase or accept or of any equivalent expression is very significant. Again, the parties have expressly

agreed on what the consequences shall be if defendant does not accept the quantities of the product specified, and, under the authorities, where this is the case no further covenant or agreement on that subject will be implied. Hawkins v. United States, 96 U. S. 689-697, 24 L. Ed. 607-610. Also, see numerous cases cited 15 Am. & Eng. Encyc. of Law, 1078.

In construing and interpreting an agreement it is to be taken as a whole, and all its provisions read together. Distinct and special provisions are to be considered when they have any relevancy to the main ones. The intent of the parties is to be ascertained, if possible, and carried out. In case of ambiguity the surrounding circumstances and the conduct of the parties, or practical construction or interpretation put upon it, are to be considered. Sometimes conduct will show the abandonment of the old written agreement and the substitution of another oral agreement. Here the surrounding circumstances, the situation of the parties, the nature of the business in which they were engaged and the character of the product, its being a new article and the result of the operation of secret processes of plaintiff's unknown to defendant, have all been considered at the insistence of the plaintiff and against the objection and protest of defendant. I think the well considered cases compel the conclusion at which I have arrived. Hale v. Finch, 104 U. S. 261-263, 266, 267, 26 L. Ed. 732; Zorkowski v. Astor, 156 N. Y. 393, 397, 50 N. E. 983; Hudson Canal Company v. Pennsylvania Coal Company, 8 Wall. (U. S.) 276, 288, 19 L. Ed. 349; Bruce et al. Executors v. The Fulton National Bank of the City of N. Y., 79 N. Y. 154, 35 Am. Rep. 505; Barker v. Pullman Company, 134 Fed. 70, 67 C. C. A. 196; Wing v. Ansonia Clock Co., 102 N. Y., 531, 7 N. E. 621; Newell v. Wheeler, 36 N. Y. 244; Arthur v. Baron de Hirsch Fund, 121 Fed. 791-795, 58 C. C. A. 67; Green v. American Cotton Company (C. C.) 112 Fed. 743-744; Hawkins v. U. S., 96 U. S. 689, 697, 24 L. Ed. 607-610. Many other cases might be cited, but it seems unnecessary.

In Hale v. Finch, 104 U. S. 261-263, 26 L. Ed. 732, one Hale sold to Finch a steamboat, and gave a bill of sale, consideration $5,000, covenanting, first, to warrant and defend title, and then the following:

"And it is understood and agreed that this sale is upon this express condition, that said steamboat or vessel is not within 10 years from the 1st day of May, 1867, to be run upon any of the routes of travel on the rivers, bays, or waters of the state of California, or the Columbia river or its tributaries, and that during the same period last aforesaid the machinery of the said steamboat shall not be run, or be employed in running any steamboat or vessel or craft upon any of the routes of travel on the rivers, bays, or waters of the state of California, or the Columbia river and its tributaries."

It was held no agreement not to use such steamer on the waters, etc., of California or Columbia river could be implied. Mr. Justice Harlan, in giving the opinion of the court, in which all concurred, said:

"There is, in terms, a covenant by Hale to Finch to defend the title to the boat and its machinery against all persons whomsoever. This is immediately followed by language implying an agreement that the sale was

upon the express condition that neither the boat nor its machinery should be used within a prescribed time upon certain waters. It is the case of a bare, naked condition, unaccompanied by words implying an agreement, engagement, or promise by the vendee that he would personally perform, or become personally responsible for its performance. The vendee took the property subject to the right which the law reserved to the vendor of recovering it upon breach of the condition specified. The vendee was willing, as the words in their natural and ordinary sense indicate, to risk the loss of the steamboat when such breach occurred, but not to incur the personal liability which would attach to a covenant or agreement upon his part, that he would not use, and should not permit others to use, the boat or its machinery upon the waters, and within the period named. If this be not so, then every condition in a deed or other instrument, however bald that instrument might be of language implying an agreement, could be turned, by mere construction and against the apparent intention of the parties, into a covenant involving personal responsibility. The vendor having expressly, and the vendee impliedly, agreed that the sale was upon an express condition—stated in such form as to preclude the idea of personal responsibility upon the part of the vendee—we should give effect to their intention, thus distinctly declared."

In Bruce v. Fulton National Bank, 79 N. Y. 154, 35 Am. Rep. 505, it was held:

"From the words of an express covenant, an additional or correlative covenant may be implied, if the language used shows that such covenant was intended; but such implication cannot be permitted where it is apparent from the contract that the parties had the subject in mind, and either one has withheld a promise in regard to it. A lease under seal, drawn technically in form, and with obvious attention to details, contained various covenants, some binding the parties mutually, some the lessor only, others the lessee. It contained a covenant, on the part of the lessor, to the effect that if the lessee should pay the rents, and perform all the covenants on his part, that the lessee 'shall and will at the end or expiration of the term,' grant to the lessee a new lease for a further term specified, at a rent to be adjusted by appraisers, but not less than that for the first term. In an action to compel the lessee to accept a new lease, held, that this was a covenant, on the part of the lessor only, from which no covenant, on the part of the lessee, to take a new lease, could be implied; and that it was optional with him, whether or not, to take a new lease."

In Zorkowski v. Astor, 156 N. Y. 393, 50 N. E. 983, it was held:

"A covenant will, not be implied unless it clearly appears from the words used that one was intended. When it is apparent that the parties to a written agreement had the subject in question in mind, and either has withheld an express promise in regard to it, one will not be implied. Where a lease of land by the owner thereof to the owner of the building thereon, so far as it relates to the subject of renewal, contains mutual covenants for an appraisal and a separate covenant by the lessor that if he does not elect to pay for the building he will grant a renewal, without any provision concerning the acceptance, by the lessee, of a renewal, but with an absolute covenant by him to surrender possession at the end of the term, a covenant by the lessee to accept, corresponding to the lessor's covenant to grant a renewal, will not be implied; and, hence, on the lessor's electing not to take the building, but to renew the lease, the lessee cannot be compelled to accept and execute the renewal lease, unless he elects so to do."

This case was cited and approved by the Circuit Court of Appeals, Second Circuit, Arthur v. Baron de Hirsch Fund, 121 Fed. 791-795, 58 C. C. A. 67, where it was held:

"Defendant, in order to aid the poorer class of Hebrews in settling in the country, executed a written contract with plaintiff by which it agreed to

loan plaintiff a certain sum to be used in the erection of houses on land belonging to plaintiff in the country, on which plaintiff agreed to give a mortgage to secure the loan. It was further stipulated that plaintiff should sell the houses to such purchasers as defendant should name, provided the purchaser would assume the payment of the mortgage to defendant, pay 10 per cent. of the price in cash, and execute a second mortgage to the plaintiff for the balance. Plaintiff was entitled to fix the prices for the houses and the terms of payment, and left free, unless the purchasers complied with such conditions, to sell to whom he chose. *Held* that, since the contract in terms did not obligate defendant to furnish purchasers or require that the purchasers named by it should comply with plaintiff's conditions, and the contract being otherwise beneficial to plaintiff, an agreement by defendant to furnish such purchasers would not be implied."

In Barker v. Pullman Company, 134 Fed. 70, 67 C. C. A. 196, the Circuit Court of Appeals, Second Circuit, held:

"Where a contract between an insurance company and a palace car company provided that the insurance company agreed, on the expiration of the palace car company's policies, to renew the same for three years at a specified rate, which agreement was signed by both parties, it constituted a mere option, which did not bind the car company to take the insurance."

In that case the agreement was as follows:

"That in consideration of one dollar and other valuable considerations, the Agricultural Insurance Company agrees, on the expiration of the present insurance policy of the Wagner Palace Car Company, to renew the same for three years for the rate of 29 17/100 annual premium, payable in nine equal installments, one each in September, October, and November, respectively of each year. The Agricultural Insurance Company agrees to give substantially the same companies comprising the syndicate now on the risk. In witness whereof the parties hereto have hereunto appended their signatures and seals the day and year first above-written.

"The Wagner Palace Car Company,
"By W. S. Webb, President.
"The Agricultural Insurance Co.,
"By————————.

"Witness: F. G. Smith."

If parties have left out some covenant by mistake the remedy is to reform the instrument. Courts have no right or license to put into a contract by implication a stipulation not found there on the ground that it would be a more fair and equitable contract so to do. The covenant sought to be implied must arise by necessary implication from the language used or by implication of law. As was said by Judge Wallace in Arthur v. Baron de Hirsch Fund, supra, page 796 of 121 Fed. page 72 of 58 C. C. A.:

"Where parties have entered into written engagements which industriously express the obligations which each is to assume, the Courts should be reluctant to enlarge them by implication as to important matters. The presumption is that, having expressed some, they have expressed all of the conditions by which they intended to be bound."

The plaintiff here having agreed to sell this special product of a composition unknown to the defendant to defendant only, on condition that it should accept certain specified amounts in years named, and that, if it did, the defendant should have the exclusive market for it in the United States and Canada, and, having provided that in case the defendant should not accept same (implying fairly it had the right

146 F.—58

not to accept) that then it should go in and occupy the market in the territory named, and it also appearing that the agreement was beneficial to the plaintiff in the absence of any agreement to accept and take and. pay for the product in any event, and the obligations of the defendant assumed by it being fully and carefully expressed, it would be making a new contract for the parties and importing into it a covenant and obligation not contained therein by either necessary or fair implication to hold that defendant has agreed to accept or take the product in the amounts specified. This is not of that class of cases where the one party orders of another certain goods to be manufactured by him, and that other agrees so to do, and nothing. is said about acceptance or payment. In such a case the law would imply a promise both to accept and pay for the articles when made.

Findings of fact and conclusions of law in accordance with this opinion will be prepared and submitted for signature.

The complaint will be dismissed on the merits.